## UNITED STATES v. SOCONY–VACUUM OIL CO., Inc., et al.

### No. 6721.

Circuit Court of Appeals, Seventh Circuit.

July 27, 1939.

William J. Donovan, of New York City, and Herbert H. Thomas, of Madison, Wis., for appellants.

John Henry Lewin, of Baltimore, Md., and Charles H. Weston and Grant W. Kelleher, both of Washington, D. C., for the United States.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These are several appeals from judgments of conviction by the District Court for the Western District of Wisconsin for violation of Section 1 of the Sherman Anti-Trust Act (Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. § 1). Appellants are twelve corporations and five of their officers and employees.[1] The indictment was returned on December 22, 1936, against twenty-four corporations engaged in the petroleum business (called "defendant major oil companies"), three trade journals, and fifty-six individuals, principally officers and employees of the defendant corporations.[2] On October 4, 1937, twenty-three of the corporations, the three trade journals and forty-six individuals were brought to trial, which continued over three and one-half months before a jury.

At the close of its case, the Government dismissed the indictment as against four major companies, the three trade journals and one individual.[3] The court, at the same time, directed verdicts for three

---

[1] The corporate appellants and their abbreviated names as described in the indictment are as follows:

Socony-Vacuum Oil Company, Inc. (Socony-Vacuum)

Wadhams Oil Company (Wadhams)

Empire Oil Refining Company (Empire)

Continental Oil Company (Continental)

The Pure Oil Company (Pure)

Shell Petroleum Corporation (Shell)

Sinclair Refining Company (Sinclair)

Mid-Continent Petroleum Corporation (Mid-Continent)

Phillips Petroleum Company (Phillips)

Skelly Oil Company (Skelly)

The Globe Oil & Refining Company (Oklahoma) (Globe)

The Globe Oil & Refining Company (Illinois) (Globe)

The individual appellants are Charles E. Arnott and H. T. Ashton of Socony-Vacuum; R. H. McElroy, Jr., of Pure; P. E. Lakin of Shell; and Robert W. McDowell of Mid-Continent.

[2] All parties named in the indictment are referred to in the briefs as "defendants" as distinguished from defendants who are now appellants, and we shall make similar designation in this opinion.

[3] The four major oil companies were Tide Water Associated Oil Company, Deep Rock Oil Corporation, Louisiana Oil and Refining Company and Cities Service and Export Oil Company. The reason assigned for dismissal as to the first was that the evidence showed the activities charged by the indictment were carried on by its predecessor company and as to the other three, either that their affairs were in the hands of a trustee during the period of the conspiracy or that they had been dissolved. The indictment as to the three trade journals and one of their officers was dismissed because of the legal insufficiency of the evidence to connect those defendants with the alleged conspiracy.

corporations[4] and four of their officers and employees. During the course of the trial the court granted motions for directed verdicts on behalf of eleven other individual defendants. The jury on the 22nd day of January, 1938, returned verdicts of guilty against the remaining sixteen corporations and thirty individuals.

On July 19, 1938, the trial court set aside the verdicts and dismissed the indictment as to ten of the convicted individuals and one of the convicted corporations. The court also granted new trials to fifteen individuals and three corporations,[5] and sustained the verdicts of the jury against the remaining twelve corporations and five individuals, appellants herein.

### The Indictment.

The indictment describes the states of Michigan, Wisconsin, Minnesota, North Dakota, South Dakota, Iowa, Illinois, Indiana, Missouri and Kansas as the market territory of defendant Standard of Indiana, sometimes known as the "Standard of Indiana Territory" by reason of said defendants' dominant position in the distribution of gasoline in each of said states. The territory is also described as the Mid-Western area. Each of the defendant major oil companies, so it is alleged, either directly or through subsidiary or affiliated companies markets gasoline in some or all of the states of such area. It is charged that the defendant companies manufacture and distribute to jobbers, dealers and consumers more than 85% of all the gasoline sold therein. It is alleged that the jobbers therein, some 4000 or more, sell more than 50% of all the gasoline sold to retail service stations and that the defendant companies supply more than 80% of the gasoline purchased by those jobbers. During the period of the conspiracy and for many years prior thereto, jobbers purchased gasoline from the defendant companies under long-term supply contracts, which uniformly provided that the price of the gasoline purchased by the jobbers should be determined by the "spot" market prices as published by two trade journals, namely, The Chicago Journal of Commerce, published in Chicago, Illinois, and Platt's Oilgram, published in Cleveland, Ohio. It is alleged that the defendant companies also distribute gasoline through retail dealers and directly to consumers through their own retail service stations, and that retail prices in the Mid-Western area are directly and substantially influenced by, and fluctuate directly with, the "spot" market price.

The indictment alleges that the defendant companies do not sell any substantial part of their gasoline on the "spot" markets. Independent refiners, located in the Mid-Continent and East Texas oil fields, sell most of the gasoline sold on a "spot" basis and the prices received therefor make the "spot" market quotations which are published each day in the market journals. It is alleged that this gasoline amounts to less than 5% of all the gasoline marketed in the Mid-Western area.

It is alleged that, beginning in the month of February, 1935, and continuing to the date of the presentation of the indictment, the defendants combined and conspired together for the purpose of artificially raising and fixing the tank-car prices of gasoline in the "spot" markets, and artificially raised and fixed said "spot" market tank-car prices of gasoline, and maintained said prices at artificially high and noncompetitive levels and thereby increased and fixed the tank-car prices of gasoline in the Mid-Western area (including the western district of Wisconsin) and arbitrarily, by reason of the provisions of the jobber contracts, exacted large sums of money from jobbers with whom such contracts were made. Thus, the defendants are charged with an unlawful combination and conspiracy in restraint of trade and commerce in gasoline in violation of the Sherman Anti-Trust Act.

Then follows the manner and means by which the conspiracy was effectuated. It is alleged that, beginning in the month of February, 1935, the defendants engaged and participated in two concerted gasoline buying programs, described as the East Texas and Mid-Continent buying programs, for the purchase by them of large quantities of gasoline from independent refiners in the East Texas and Mid-Continent fields. The independent refiners selling in the programs are named as co-conspirators, but not as defendants. The substance of the buying programs, as alleged, is that the

---

[4] Gulf Oil Corporation, Gulf Refining Company and the Texas Company.

[5] United States v. Standard Oil Company (Ind.) et al., D.C., 23 F.Supp. 937.

The names of such defendants are set forth in this opinion, together with the court's reason for its action.

defendants by their agents and representatives, purchased large quantities of gasoline in accordance with allocations made to the various major companies and that such purchases amounted to nearly 50% of all the gasoline sold by said independent refiners; that such purchases were in excess of the amounts which the defendant companies would have purchased apart from their participation in said buying program, and that said purchases were made at uniformly high, arbitrary and non-competitive prices for the unlawful purpose of increasing the "spot" tank-car price. It is also alleged that the independent refiners, at the instigation of the defendants, curtailed their production of gasoline.

Then follows a paragraph with reference to the "participation of market journals." It is alleged that such journals (theretofore named), together with certain of their officers, participated in the combination and conspiracy, and aided the other defendants in effectuating the same. The market journals are described as "the chief agencies and instrumentalities through which the wrongfully and artificially raised and fixed prices for gasoline paid by the major oil companies have affected the prices paid by jobbers, retail dealers and consumers for gasoline in the Mid-Western area." It is alleged that the quoted price published in said market journals was represented to be the price prevailing in "spot" sales to jobbers in tank-car lots when, as a matter of fact, the quotations thus published were the artificially raised and fixed prices paid by the defendant companies in the buying programs.

The indictment then concludes with a paragraph entitled "Jurisdiction and Venue" wherein it is alleged that the defendant companies sold large quantities of gasoline in tank-car lots to jobbers within the western district of Wisconsin at the artificially raised and fixed and non-competitive prices, and that retail dealers and consumers in said district have been required to pay artificially increased prices for gasoline by reason of the combination and conspiracy and pursuant to the purposes and ultimate objectives thereof.

## Statement of Facts.

The record, as might be expected, is voluminous, and we find it difficult to compress the relevant facts in an opinion of reasonable length. The difficulty is increased by the widely disagreeing views of the respective parties as to what the essential facts are. At this point we shall only undertake to review what seem to be the more salient, leaving to a subsequent time facts material in connection with the numerous questions which are presented.

This case is concerned primarily with the marketing of gasoline in the Mid-Western area. (Indictment territory.)[6] In normal times this area is supplied chiefly with gasoline refined from crude oil produced in the Mid-Continent oil fields. Over 21% of all the gasoline sold in the United States in 1935, amounting to almost five billion gallons, and over 25% in 1936, amounting to nearly five and one-half billion gallons, was sold in this territory.

The oil industry has four primary functions: (1) Producing crude oil from the earth; (2) transporting it to refineries; (3) refining it into commercial products and (4) marketing the products. In the marketing process there are usually three units: the refiner, the jobber and the dealer. The refiner produces the gasoline; the jobber purchases it from the refiner in tank-car lots, stores it in bulk storage plants and resells it to the dealer in tank-wagon lots.

A major oil company is one engaged in all branches of the industry. It produces and stores substantial amounts of crude oil, refines a substantial part of the gasoline which it sells, and owns large amounts of gasoline storage capacity at the refinery. It operates bulk storage plants in the marketing area from which gasoline can be distributed by tank-wagons to retailers. In most instances it operates service stations where its product is sold at retail. Most of the corporate defendants in this case are major oil companies. An independent refiner, as described in the indictment, is one engaged largely in the business of refining, usually has few, if any, bulk storage plants, and seldom operates service stations. The independent refiners far exceed the major companies in number,

---

6 The Mid-Western area is also referred to and described in the indictment as "Standard of Indiana territory." At the time of the indictment Standard of Indiana controlled about 22% of the business, was doing more business than any one of its competitors and was known as the "market leader" in that territory.

but their business is comparatively small. Some eighteen major companies sell about 85% of the gasoline consumed in the Mid-Western area, while some seventy independent refiners sell only 15%. Appellants marketed about 54% of the gasoline sold in this territory in 1935. Over 25% was sold by Texas, by Standard of Indiana, and Barnsdall. A jobber is a "middle man" who purchases gasoline in tank-car lots, generally from refiners, and owns storage or bulk plants from which he delivers gasoline in tank-wagons or trucks to service stations or directly to large consumers. In 1935 and 1936 there were more than 4000 jobbers doing business in the Mid-Western area.

At the time the indictment was returned and for many years prior thereto, most jobbers purchased their gasoline in tank-car lots under contracts in which they agreed to purchase, generally for a period of one year, all their gasoline requirements from a single refinery. The defendants prescribed the form of contract made by jobbers purchasing from them. These contracts varied somewhat in form, but generally the price to be paid by virtue of the contracts was upon the basis of what was known as "spot market quotations" appearing daily in one or both of the two defendant trade journals. The price was determined by averaging the high and low "spot" market quotations as they appeared therein. The contracts usually recognized the Standard of Indiana as the market leader in the territory and contained a provision to the effect that the buyer was to have a margin of 5½¢ per gallon under the service station price as posted by that company. The retail service station prices posted by that company were also followed by jobbers, refiners and retailers. The selling price fixed by that company, as well as by all others, bore a direct relation to the "spot" market quotations during the indictment period. The normal retail price was usually 5½¢ per gallon more than the "spot" market price.

The daily "spot" market is determined by sales for that day in private transactions at refineries in the field. The principal part of the gasoline on such market is sold by the independent refiners and constitutes from 5% to 7½% of all gasoline sold in the Mid-Western area. The major companies, by reason of storage facilities and their own means of disposing of gasoline, have a more assured outlet than the independent refiners who must depend largely on the "spot" tank-car market. The major companies frequently were required to purchase from the independent refiners prior to the time of the buying programs hereinafter referred to.

Thus the Government contends that at the beginning of the indictment period and continuing through 1935 and 1936, the prices at which the defendants sold the great bulk of their gasoline were directly controlled and determined by prices received by independent refiners of a relatively small amount of gasoline by reason of the following:

(1) The prices of all gasoline sold by the defendants to jobbers under contract were based upon the spot market quotations as published by the two trade journals.

(2) The prices of all gasoline sold at retail by the defendants were based upon the same spot market quotations.

(3) The spot market prices published in the journals were the result of spot sales by independent refiners of gasoline amounting to not more than 7½% of all the gasoline sold in the Mid-Western area.

Prior to a statement concerning the alleged unlawful buying programs, it seems appropriate to refer to the history of the oil industry during the two-year period prior to the indictment, and the efforts during that time to rehabilitate and stabilize the same, upon which appellants lay great stress.

Many pages of the briefs are thus occupied and again we do not find it easy to condense such a statement and do justice to both sides. It is plainly apparent that for several years prior to the alleged conspiracy, the gravest problem confronting the oil industry was the over-production of crude oil, which inevitably resulted in an over-supply of gasoline. This meant a decline in prices often below the cost of production. As new fields were developed, the problem became more acute. Both State and Federal Governments actively engaged themselves in attempting to remedy and solve the problems in various ways, such as curtailment of production, buying programs and the fixing of prices at which crude oil could be sold. The States of Texas, Oklahoma and Kansas, passed proration laws limiting production. Crude oil produced in violation of such laws became known as "hot oil" and the gasoline manufactured therefrom, as "hot

gasoline." The states had little success in the enforcement of such laws and as a result legal gasoline was at a great disadvantage in meeting competition. Out of this situation grew price wars of much concern to Governmental agencies, which resulted in great loss to all branches of the industry engaged in the legitimate field.

Beginning in March, 1933, the Federal Government, the interested states and the industry joined in a general movement to eliminate such destructive practices and to restore healthy competitive conditions. The record sustains appellants' statement that it was sought to accomplish three principal objectives:

(1) The restoration of the price of crude oil to a minimum of $1 per barrel. That was the minimum price at which the vast majority of the crude oil wells of the country could operate.

(2) The restoration of the price level of gasoline at wholesale at the refinery to "parity" with crude oil; that is, a price which would reflect the normal relation between the price of gasoline and the price of crude oil from which it is manufactured.

(3) The stabilization of retail prices at a normal spread or margin between the refinery price of gasoline and the retail price.

In June, 1933, Congress passed the National Industrial Recovery Act (48 Stat. 195) which authorized the President to forbid the interstate shipment of oil or gasoline produced or manufactured in violation of state proration laws. On July 11, 1933, the President, by Executive proclamation, forbade such shipments. Under this Act a Code was formulated prohibiting sales below cost, defining the natural parity relationship between the price of a barrel of crude oil and a gallon of refined gasoline as 18.5 to 1, and authorized the fixing of minimum prices for crude oil and its products. The President appointed the Secretary of the Interior to be the Administrator of such Code, and the Secretary selected members of his staff, known as the Petroleum Administrative Board. A committee, known as the Planning and Coordination Committee, to aid in the administration of the Code, was appointed by the President. In addressing this committee in September, 1933, the Secretary of the Interior said: "Gentlemen, we have a solemn duty to perform. Our task is to stabilize the oil industry upon a profitable basis. This is the keen desire of the Administration and we will work with you constantly to that end. * * *"

By September 29, 1933, the price of crude oil was established at $1.00 per barrel and that was the minimum price maintained throughout the Code period. On one occasion the Secretary approved an order fixing minimum prices based upon the cost of production and manufacture for crude oil, gasoline and other petroleum products, but this order never became effective. In April, 1934, an amendment to the Code was adopted under which an attempt was made to balance supply and demand of the refined product by allocating the amount of crude oil which each refiner could process. The Government sponsored various buying programs wherein the major companies contracted to relieve the independent refiners of their surplus gasoline at prices above the going market. It appears that these programs were later suspended because of doubtful legality. "Hot oil" constituted the chief stumbling block to the success of the various programs. Refiners in the field could procure such oil for 35¢ or less a barrel, and manufacture gasoline therefrom for 2¢ or 2½¢ a gallon, while the parity price based upon $1.00 oil was from 5¢ to 6¢.

Another term which finds much use in this case is "distress gasoline." This is described by appellants as legal gasoline manufactured by independent refiners who had to dump it on the market for whatever price it would bring. It is pointed out that the purchase contract of the independent refiner required him to take all the crude oil which the seller was permitted by law to produce. Any cessation of his refinery operations would result in the loss of his crude oil connections. Thus he was compelled to manufacture gasoline regardless of the demand. The Government contends that the term "distress gasoline" is a misnomer and that it constituted nothing more than a surplus.

In July, 1934, members of the Petroleum Administrative Board called on appellant Arnott, Chairman of the Marketing Committee of the Planning and Coordination Committee, and requested that he undertake the responsibility of heading a voluntary cooperative movement to deal with price wars. This he agreed to do, pointing out

that it would be necessary to eliminate "hot oil" and "distress gasoline." Under date of July 20, 1934, Arnott received a letter from the Secretary of the Interior which, after reviewing the price wars existing in many localities and the resultant effect which they were having upon the market for oil products, pointed out that the existing conditions would tend to frustrate the purposes of the National Industrial Recovery Act by increasing unemployment, reducing standards of labor, and preventing the rehabilitation of the industry. Arnott was authorized to confer, negotiate and hold public hearings for the purpose of stabilizing the price level. In October, 1934, a "Federal Tender Board" was appointed by the Secretary of the Interior for the purpose of preventing shipment in interstate commerce of "hot oil" and "hot gasoline." Thereafter, oil or gasoline could only be shipped in interstate commerce when accompanied by a certificate or tender issued by the Board certifying as to the legality of its production or manufacture. This action had its immediate effect, increasing the "spot" market tank-car price of gasoline by $1\frac{3}{8}\not\!c$. The Tender Board was stripped of its authority by the decision of the court in Panama Refining Company v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. To meet the emergency thus created, Congress, in February, 1935, passed the Connally Act (15 U.S.C.A. § 715 et seq.) which again prohibited the shipment in interstate commerce of "hot oil" and "hot gasoline," and again the price of gasoline rapidly increased.

We shall now discuss the alleged unlawful buying programs. The formation and operation of the Mid-Continent program is not in dispute. Appellants (with the exception hereinafter noted) admit that they participated in a concerted program for the purchase of gasoline from independent refiners in the Mid-Continent fields at "going market prices" from March, 1935 to May, 1936, for the purpose of stabilizing the tank-car market. The program was organized at a series of meetings held during the first three months of 1935. The first meeting, called by appellant Arnott and attended by all of the appellants, was held in Chicago, January 4, 1935. At this meeting a committee was appointed called the "Tank-car Stabilization Committee," consisting of eight representatives of the defendant companies, including appellants Ashton and McDowell. The situation confronting the industry was discussed at this meeting and it was generally conceded that the gains achieved in stabilizing the retail market could not be maintained unless some action was taken with reference to "distress gasoline." The Stabilization Committee had three meetings—one on February 5th in Chicago, another on February 11th in Chicago, and the third on March 5th in St. Louis, Missouri. Without going into detail as to what took place at these meetings, we think the substance of what was accomplished and agreed upon was that the major companies would purchase from the independent refiners the latters' surplus gasoline at going market prices. Surveys disclosed that this surplus gasoline of the independent refiners in the Mid-Continent fields amounted to from 600 to 700 cars each month. Defendant Bourque was designated to make surveys with the view of ascertaining the amount of surplus gasoline and furnishing such information to the defendant companies. A mechanical sub-committee consisting of one Jacobi, the appellant McDowell, and the defendant Tuttle, was appointed to assist in the disposal of surplus gasoline not anticipated by the monthly surveys. It was also a part of the function of this sub-committee to urge companies to pay the fair going market price. The plan was a voluntary one and we find nothing in the record to indicate that anyone participating in the program was to be penalized for noncompliance therewith. The independent refiners who sold to the defendants in the program met with the defendants and agreed to cooperate.

The program commenced operation on March 7, 1935. During that month between 500 and 600 cars were purchased by the defendants, and thereafter, continuing through April, 1936, their purchases amounted to between 600 and 800 cars per month. The Tank-car Stabilization Committee held monthly meetings at which the surveys with reference to surplus gasoline were considered. There is evidence to the effect that the committee recommended the amount which each company should purchase and that the companies felt a moral obligation to comply therewith. The Mechanical Sub-Committee also met frequently and was in frequent contact with the purchasing companies, oftentimes urging them to increase the amount of their purchases. The defendant companies reported monthly to Bourque the volume of

purchases and the prices paid in connection therewith. Although there is evidence that the defendants in some instances purchased more gasoline than they actually required, it was all disposed of in the usual channels of trade. There is evidence, rather indefinite and uncertain, that certain employees of the purchasing companies considered that allocations were being made along lines similar to those which had been made under the Code, and that the companies were obligated with respect to such allocations; but the record is far from convincing in this respect. The Tank-car Stabilization Committee was concerned with the price at which purchases were to be made, but it seems the Committee was chiefly interested with prices not below the going market price. In fact, no purchases were made above that price and prices actually paid to the independent refiners varied considerably. This was especially true during March, 1935, when three or four different prices were paid on the same day by the purchasing companies. More than one price was paid on 72% of a certain number of days on which purchases were made in the early part of the alleged conspiracy. The evidence concerning the amount of gasoline purchased by the defendants varies widely. The Government contends that from 34% to 51% in 1935, and from 38% to 58% in 1936, of all the gasoline sold on the "spot" market by the Mid-Continent independent refiners named in the indictment, and from approximately 20% to 30% during both years of all the gasoline sold on such market by twenty-nine independent refiners in the Mid-Continent field was purchased by the defendants; while defendants contend that the total amount purchased from the independent refiners was from 18% to 27%. The Government contends there is evidence to sustain the allegation that the independent refiners "curtailed their production of gasoline," while appellants contend to the contrary.[7]

The fact is undisputed that the production of the independent refiners in 1935, over the previous year, was from 17% to 21% greater, and that in 1936, the production was 12% greater than in 1935. The Government points out that this situation is deceptive, inasmuch as production was curtailed under the Code during 1934 and the first five months of 1935.

The East Texas buying program referred to in the indictment may be described more briefly. Early in 1935, certain independent refiners in East Texas formed an association called the East Texas Refiners Marketing Association. The purpose of this association was to find a market for its surplus gasoline, and in an effort to accomplish this purpose, it contacted certain of the officials interested in the Mid-Continent program. Previous to this time the East Texas refiners had sold only a small part of their product in the Mid-Western area. Shortly thereafter, certain of the defendant companies commenced purchasing through the association and purchased an average of 600 to 700 cars monthly. The purpose of this buying program was similar to that of the Mid-Continent, i. e., for the purpose of stabilizing the gasoline market.

The defendants evidently realized the importance of buying the surplus product from the Texas field if their effort in the Mid-Continent field was to succeed. This program, like the other, contemplated the purchase of gasoline at fair going market prices and the prices paid generally coincided with the low quotations of Platt's Oilgram. We think it is fair to state, however, that this program was largely under the control of the Secretary of the East Texas Association, and that the program has more of the earmarks of a seller's program by that association than a buyer's program by the defendants. Here again the evidence is in conflict as to the amount purchased—the Government contending that in 1935 the defendants purchased 20% of the total production of all the independent refiners in the East Texas field, while defendants contend that it was about 12%.

It is the contention of the Government that the buying program produced an artificial and non-competitive condition of the tank-car market during the indictment period. We shall reserve discussion of this contention to a later time. The fact is, however, there was a consistent rise in price from March to May of 1935. The increase amounted to about 1½¢ per gallon between February and June 1st, and from that time until the end of 1935, the price level remained firm, with only slight deviations. The increase in price was attributed by numerous witnesses to the buying pro-

---

[7] This matter is discussed later and we conclude that there is no competent evidence in support of the allegation.

grams, although there is substantial evidence that other factors contributed to such increase. In the early part of January, 1936, prices were advanced ½¢ in conformity with a comparable advance in the price of crude oil.

## Contested Issues.

Of the many contested issues and assignments of error, we shall only undertake to discuss those which have been argued by the respective parties. Such issues stated by appellants in the affirmative—the Government contending to the contrary as to each—are:

I. There was a total failure of proof as to the essential allegation of the indictment, namely, that the defendants conspired to fix the spot market price of gasoline by purchasing gasoline under two buying programs at high, artificial and agreed on prices and causing such prices to be published in the trade journals and falsely representing them as spot market prices paid by jobbers in purchasing gasoline from independent refiners.

II. There was a material and prejudicial variance between the charge of the indictment and the issues on which the case was permitted to go to the jury.

III. The court committed reversible error in overruling the defendants' motions for directed verdicts.

IV. The trial court committed prejudicial error by (a) improperly limiting the extent to which the jury could consider the facts and circumstances surrounding the defendants' activities, and (b) instructing the jury that an agreement embracing the raising of prices by a group controlling a substantial amount of the trade in a commodity is illegal per se. By so doing the court, in effect, directed a verdict against the defendants.

V. The court committed prejudicial error in excluding the evidence offered by the defense as to the facts and circumstances surrounding the alleged agreement in restraint of trade.

VI. The District Court for the Western District of Wisconsin had no jurisdiction to try these defendants because the proof failed to establish that any overt act was committed within the Western District of Wisconsin.

VII. The court erred in the admission of evidence.

VIII. The court erred and abused its discretion in denying the several motions of defendants for a new trial.

IX. The trial court committed reversible error in using and permitting Government counsel to use alleged transcripts of testimony before the grand jury in the examination of important witnesses.

X. The court committed reversible error in permitting Government counsel to make to the jury arguments which constituted appeals to passion, prejudice and class distinction and tended to induce the jury to disregard the record evidence.

Before discussing the questions thus presented, we think it would be well to give consideration to a basic proposition, recognized as such by both parties, and about which revolve most of the questions concerning substantive law. The question: Does the proof disclose a violation of the Statute unlawful per se?

The position of the Government, forcibly presented, is that the purpose and effect of the conspiracy charged was to fix and control the market price of gasoline and that such a combination is unlawful per se; while on the other hand it is contended by the appellants with equal force that the purpose was merely the stabilization of the industry by the elimination of a competitive abuse, the admitted effect of which was to raise the price, and that such action was not within the condemning statute. The Government relies strongly upon the case of United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and cases therein cited, while appellants place almost as great a reliance upon Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, and the cases therein referred to. We shall first consider the Government's position.

The condemning statute (Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. § 1) provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." The enactment generally was accepted, as including every combination which placed any restraint upon interstate commerce until the decisions of the Supreme Court in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann.Cas.1912D, 734, and United States v. American Tobacco Co., 221 U.S.

106, 31 S.Ct. 632, 55 L.Ed. 663, wherein the now historic "rule of reason" was promulgated. The court, in the latter case, in referring to its opinion in the former, on page 179 of 221 U.S., 31 S.Ct. on page 648, 55 L.Ed. 663, said: "It was therefore pointed out that the statute did not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose." The decisions of the courts, including the Supreme Court, thereafter may be said generally to divide themselves into two classes, namely: Those in which the restraint has been held unlawful per se and those in which the character of the restraint remained open for determination. In each class the restraint imposed upon trade was the object of attack and was determined largely by its effect upon competition. In the former class, those in the combination controlled such a large proportion of an industry as to give them the power to suppress or destroy competition, with the inevitable result that the restraint upon trade was unreasonable as a matter of law. In the latter class, where power to suppress or destroy competition is not shown, the restraint imposed is susceptible of investigation with a view of determining whether it is reasonable or otherwise.

■ A reading of the authorities is convincing that no hard and fast rule can be utilized in determining whether this or that case controls. As was said in Maple Flooring Ass'n v. United States, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093: "It should be said at the outset that in considering the application of the rule of decision in these cases to the situation presented by this record, it should be remembered that this court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied."

A view of the instant situation, as favorable to the Government as the facts justify, discloses that defendants, by concerted effort, agreed to purchase on the "spot" market surplus gasoline for the purpose of raising the price on such market, thus enabling them to increase the market price in the Mid-Western area where the price bore a direct relation to the "spot" market price. The program involved the purchase of from 600 to 700 cars of gasoline per month in each of the buying programs. There seems to be no dispute but that this represented the amount of surplus—that is to say, the supply in excess of the regular demand. It also represented, according to the Government's contention, 20% to 30% sold on the "spot" market by independent refiners in the Mid-Western field and about 20% in the East Texas field, and according to appellants' contention, about 18% to 27% in the former field and 12% in the latter. Assuming that the Government's calculation is correct, it means that the program called for the purchase of from one-fifth to nearly one-third of the gasoline sold by independent refiners in the former field and one-fifth in the latter. In this connection, it perhaps is pertinent to point out that gasoline sold on the "spot" market constituted only from 5% to 7½% of the gasoline sold in the indictment territory; that about 80% of all gasoline sold in the territory was sold by the defendants.[8] There was sold in the Mid-Western area in 1935, about five billion gallons of gasoline and in 1936, nearly five and one-half billions, which constituted in 1935 about 21% of the total amount of the products sold in the United States and about 25% in 1936. The record discloses that the plan was voluntary, without coercion, and with no penalty imposed for non-compliance with the recommendation made by the Tank-car Stabilization Committee. It is true that this committee recommended prices at which it was expected the purchases would be made, but these recommendations were based either upon the low or lower-than-the-spot-market quotations. Inasmuch as these quotations varied from day to day, the prices paid by the defendants in the buying program likewise varied.

A mere statement of these facts makes it plain that they present such a marked variance from those in the Trenton Potteries case as to make doubtful its appli-

[8] Appellants contend that this percentage is unfair to them inasmuch as it includes amounts sold by Texas, Barnsdall, and Standard of Indiana, who were either acquitted in the court below or granted a new trial. The effect of this situation will be hereafter discussed.

cability. In that case the indictment charged "a combination to fix and maintain uniform prices for the sale of sanitary pottery." [273 U.S. 392, 47 S.Ct. 378, 71 L. Ed. 700, 50 A.L.R. 989.] The members of the combination included 82% of the manufacturers and distributors of such products in the United States. The combination agreed upon a definite price at which their products were to be sold. The essential argument urged upon the Supreme Court was that the case should have been submitted to the jury on the question as to the character of the restraint. It was argued that the price fixed was reasonable and, therefore, the restraint was not unreasonable. In holding to the contrary and that the combination was unlawful per se, the court approved of the charge given by the trial court, that " '* * * The law is clear that an agreement on the part of the members of a combination controlling a substantial part of an industry, upon the prices which the members are to charge for their commodity, is in itself an undue and unreasonable restraint of trade and commerce. * * *' " On the following page [273 U.S. 397, 47 S.Ct. 379, 71 L.Ed. 700, 50 A.L.R. 989], the court said: "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of to-morrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable. * * *" The case thus deals entirely with the price fixing combination on the part of those controlling the essential portion of the product, with the resultant power to eliminate competition.

The Government also relies upon holdings in prior cases which the court in the Trenton Potteries case relied upon as authoritative precedents for its decision. The four principal cases so relied upon were United States v. Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Joint Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, and Swift & Company v. United States, 196 U.S. 375, 25 S. Ct. 276, 49 L.Ed. 518. It is argued by the Government that of these four cases, only the two freight association cases were like the Trenton Potteries case, combinations to fix and maintain uniform minimum selling prices (the railroads' freight rates being the equivalent of a manufacturer's selling price).

It is further argued that the Addyston case and the Swift case disclose combinations not to fix prices, but to raise prices. We do not believe this is a correct appraisal of those cases. In the former at page 237 of 175 U.S., 20 S.Ct. on page 106, 44 L.Ed. 136, it is said: "The defendants acquired this power by voluntarily agreeing to sell only at prices fixed by their committee, and by allowing the highest bidder at the secret auction pool to become the lowest bidder of them at the public letting."

It is true that the defendants intended and agreed to increase prices, but this purpose was to be accomplished by an agreement to sell only at prices fixed by the committee. The very essence of the combination was therefore the agreement to fix prices. There is language in the Swift case which affords some support to the Government's argument, but that case is likewise distinguishable from the present by the statement of the court on page 392 of 196 U.S., 25 S.Ct. on page 277, 49 L.Ed. 518: "For the same purposes, and to monopolize the commerce protected by the statute, the defendants combine 'to arbitrarily, from time to time, raise, lower, and fix prices, and to maintain uniform prices at which they will sell' to dealers throughout the states. This is effected by secret periodical meetings, where are fixed prices to be enforced until changed at a subsequent meeting. The prices are maintained directly, and by collusively restricting the meat shipped by the defendants, whenever conducive to the result, by imposing penalties for deviations, by establishing a uniform rule for the giving of credit to dealers, etc., and by notifying one another of the delinquencies of such dealers, and keeping a black list of delinquents, and refusing to sell meats to them."

Thus it seems that the concerted action there condemned involved price fixing with penalties imposed for deviations therefrom. It is of more importance, however, as hereinafter pointed out, that in each of these cases competition was eliminated. It is also of some significance to note that they were decided prior to the decisions of the court in Standard Oil Co. v. United States, and United States v. American Tobacco Company, supra. Another case which the Government urges in support of its contention is that of Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L. Ed. 859. Again we think that case is distinguishable from the present one upon the facts. There the product was sugar and the defendant companies refined practically all the imported raw sugar processed in this country. They provided more than 80% of all the sugar consumed in the United States. Discussing the agreement involved, the court, 297 U.S. page 582, 56 S.Ct. page 635, 80 L.Ed. 859, said: "The distinctive feature of the 'basic agreement' was not the advance announcement of prices, or a concert to maintain any particular basis price for any period, but a requirement of adherence, without deviation, to the prices and terms publicly announced."

While the court found that the concerted action imposed an unreasonable restraint, we do not understand that it was found to be unlawful per se. In other words, the court considered the nature and character of the industry as well as certain trade abuses and evils with which the industry was afflicted in making its determination. On page 598 of 297 U.S., 56 S. Ct. page 642, 80 L.Ed. 859, it said: "* * Voluntary action to end abuses and to foster fair competitive opportunities in the public interest may be more effective than legal processes. And co-operative endeavor may appropriately have wider objectives than merely the removal of evils which are infractions of positive law. Nor does the fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, require that abuses should go uncorrected or that an effort to correct them should for that reason alone be stamped as an unreasonable restraint of trade."

It was pointed out that the defendants went further than was necessary in an attempt to correct the evils and abuses incident to its business, and on page 601 of 297 U.S., 56 S.Ct. on page 643, 80 L.Ed. 859, the court said: "* * * The un-reasonable restraints which defendants imposed lay not in advance announcements, but in the steps taken to secure adherence, without deviation, to prices and terms thus announced. It was that concerted undertaking which cut off opportunities for variation in the course of competition however fair and appropriate they might be."

█ We think we have referred to the strongest of the many cases relied upon by the Government, and we reach the conclusion that they do not support the contention that the evidence here discloses a price fixing agreement unlawful within it-' self.

We now come to the case of Appalachian Coals, Inc., v. United States, supra, which appellants designate as "the leading case," and upon which the argument is largely predicated that the trial court erred in its refusal to direct a verdict in favor of the appellants. We think it must be conceded that there is much support in this case for appellants' contention. There an attempt was made to remedy competitive evils in the coal industry by concerted action among competitors. The defendants were 137 producers of bituminous coal in what was known as the Appalachian territory, which included all or parts of four states. In this territory and the immediately surrounding area, the defendants produced 54.21% of the total production or 64% if the output of "captive" mines (those producing for the consumption of the owners) be deducted; and excluding tonnage in the immediately surrounding territory, the defendants' production amounted to 74.4% of the total production. Approximately 73% of the producers agreed to the concerted action. These producers created Appalachian Coals, Inc., an exclusive selling agency in which they held all the capital stock. It was agreed that the company should sell all coal produced at the best prices obtainable and if all could not be sold, to apportion the same among the defendants on a stated basis. It was the Government's contention, sustained by the lower court, that the plan violated the Sherman Anti-Trust Act in that it eliminated competition among the defendants themselves, and also gave the selling agency power substantially to affect and control the price of bituminous coal in many interstate markets. The defendants contended that the selling agency did not have the power to dominate or fix the price of coal in any consuming market;

that the price of coal would continue to be set in an open competitive market; and that their plan by increasing the sale of bituminous coal from Appalachian territory would promote rather than restrain interstate commerce. There, as here, the essential problem facing the industry was over production. This unfavorable condition had been aggravated by what the court designated as "distress coal." The court recited the efforts made by operators and by state and national officials seeking to remedy the situation. No attempt was made to limit production. It was found that as between the defendants themselves, competition would be eliminated. As the court said, page 367 of 288 U.S., 53 S.Ct. page 477, 77 L.Ed. 825: "* * * This was deemed to be the necessary consequence of a common selling agency with power to fix the prices at which it would make sales for its principals."

In discussing the situation with which the defendants were confronted, the court on page 372 of 288 U.S., 53 S.Ct. on page 478, 77 L.Ed. 825, said: "* * * The evidence leaves no doubt of the existence of the evils at which defendants' plan was aimed. The industry was in distress. It suffered from overexpansion and from a serious relative decline through the growing use of substitute fuels. It was afflicted by injurious practices within itself— practices which demanded correction. If evil conditions could not be entirely cured, they at least might be alleviated. The unfortunate state of the industry would not justify any attempt unduly to restrain competition or to monopolize, but the existing situation prompted defendants to make, and the statute did not preclude them from making, an honest effort to remove abuses, to make competition fairer, and thus to promote the essential interests of commerce. The interests of producers and consumers are interlinked. When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry. So far as actual purposes are concerned, the conclusion of the court below was amply supported that defendants were engaged in a fair and open endeavor to aid the industry in a measurable recovery from its plight. The inquiry then, must be whether despite this objective the inherent nature of their plan was such as to create an undue restraint upon interstate commerce."

On the following page, in discussing the effect upon prices, it is said: "The contention is, and the court below found, that while defendants could not fix market prices, the concerted action would 'affect' them, that is, that it would have a tendency to stabilize market prices and to raise them to a higher level than would otherwise obtain. But the facts found do not establish, and the evidence fails to show, that any effect will be produced which in the circumstances of this industry will be detrimental to fair competition. A co-operative enterprise, otherwise free from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint merely because it may effect a change in market conditions, where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities."

The court reviews a number of its previous holdings, including that of United States v. Trenton Potteries Company, supra. With reference to that case, it said: "* * * defendants, who controlled 82 per cent. of the business of manufacturing and distributing vitreous pottery in the United States, had combined to fix prices. It was found that they had the power to do this and had exerted it." It then proceeds: "* * * In the instant case there is, as we have seen, no intent or power to fix prices, abundant competitive opportunities will exist in all markets where defendants' coal is sold, and nothing has been shown to warrant the conclusion that defendants' plan will have an injurious effect upon competition in these markets."

It was concluded that the elimination of competition among the defendants themselves was not sufficient to condemn the plan, in view of the fact that there remained active competition upon the open market.

The Government points out in that case that the court was dealing largely with what it designated "distress coal" and that surplus gasoline, involved in the buying program in the instant case, does not present a comparable situation. It correctly argues that the coal producer necessarily produces more than one grade of coal and that he is forced to produce those grades for which there is no ready market in order to produce the grades for which there is a market; that only the former is designated as "distress." It is also pointed out that no such situation exists in the pro-

duction of gasoline and that, therefore, the designation of surplus gasoline as "distress" is a misnomer. On the other hand, appellants contend that the refiner is compelled to produce more than market requirements because of his contracts with the oil producers which require him to accept a certain amount of crude oil under penalty of losing his contract. We do not deem it necessary to go into the merits of these respective contentions, although we must confess we do not see any marked distinction between a distress product such as described in the Appalachian case and a surplus product with which we are here concerned. In either instance it is a recognized evil, productive of price wars, unfair competition and detrimental to the best interests of every one connected with the business, from producer to retailer.

We can not close our eyes to a theory prevalent in this country, widely proclaimed and embraced by many, including the Government itself, that overproduction, resulting in a huge surplus, is an evil, the effect of which is demoralizing to the industry concerned. This theory has been given general recognition, as well as application, by producers, associations and organizations representing the same, and by both Federal and State Governments. In American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093, Justice Brandeis, in his dissenting opinion, gave emphatic expression to the evil of overproduction. On page 417 of 257 U.S., 42 S. Ct. on page 123, 66 L.Ed. 284, 21 A.L.R. 1093, he said: " * * * The purpose of the warnings was to induce mill owners to curb their greed—lest both they and others suffer from the crushing evils of overproduction. Such warning or advice, whether given by individuals or the representatives of an association, presents no element of illegality."

■ This record is replete with testimony that the Government over a course of years, made a valiant effort, succeeding to a marked extent, in increasing the price of crude oil by disposing of the surplus and limiting production. If there is any one thing completely established, it is that the oil industry, as well as numerous Governmental agencies, Federal and State, have recognized surplus crude oil and surplus gasoline as a distress product, the elimination of which was not only desirable, but necessary, if the industry was to survive,

to say nothing of prospering. This situation alone can not be relied upon as a defense, but it affords justification for the action of the defendants in treating surplus gasoline as an evil of the industry and in making a concerted effort to eliminate the same with a view of stabilizing the market, even though an increase in price might result; provided, of course, the program, either as planned or executed, did not go so far as to constitute an unreasonable restraint by unduly suppressing or interfering with fair competition. And we do not think this conclusion is in conflict with the decision of the court in the Trenton Potteries case. There the court was considering a plan, which in its very nature, destroyed competition. It was not even claimed there was any purpose or object to correct a competitive abuse in the industry. There is nothing in the opinion to indicate that an agreement to raise or affect prices by the elimination of a competitive abuse is per se illegal or that the character of the restraint is not a proper jury question, under such circumstances.

■ A study of the decisions of the Supreme Court convinces one that the criterion employed in determining whether concerted action is such as to come within the condemnation of the statute, is the effect which the action has upon fair competition. If concerted action destroys competition, it is immediately branded as unlawful. In the Trenton Potteries case, as heretofore pointed out, competition was destroyed under facts there existing by reason of the price fixing agreement. Conceivably, however, a price fixing agreement is not unlawful per se under all circumstances as is evidenced by the holding of the court in Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207. The court there recognized the assailed agreement as being of a price fixing nature. On page 238 of 246 U.S., 38 S.Ct. on page 244, 62 L.Ed. 683, Ann.Cas. 1918D, 1207, it said: " * * * The case was rested upon the bald proposition, that a rule or agreement by which men occupying positions of strength in any branch of trade, fixed prices at which they would buy or sell during an important part of the business day, is an illegal restraint of trade under the Anti-Trust Law. But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agree-

ment concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps ·thereby promotes competition or whether it is such as may suppress or even destroy competition."

In Appalachian Coals, Inc. v. United States, heretofore discussed, the ultimate factor from which the court reached its conclusion that the assailed agreement was not violative of the statute, was that "abundant competitive opportunities will exist in all markets where defendants' coal is sold." In other words, fair competition was preserved rather than destroyed. This test has been applied and enforced in many, if not all, of the other cases to which our attention has been called. We shall make reference to a few of the many.

In Sugar Institute v. United States, supra, 297 U.S. on page 586, 56 S.Ct. on page 637, 80 L.Ed. 859, the question is thus stated: "* * * The crucial question—whether, in the ostensible effort to prevent unfair competition, the resources of fair competition have been impaired—is presented not abstractly but in connection with various concrete restrictions to which the decree below was addressed."

In Maple Flooring Ass'n v. United States, supra, the court on page 578 of 268 U.S., 45 S.Ct. on page 583, 69 L.Ed. 1093, said: "* * * In·our view, therefore, the sole question presented by this record for our consideration is whether the combination of the defendants in their exist-·ing association, as actually conducted by them, has a necessary tendency to cause direct and undue restraint of competition in commerce falling within the condemnation of the act."

In Dr. Miles Medical Co. v. John D. Park & Sons. Co., 220 U.S. 373, on page 408, 31 S.Ct. 376, on page 384, 55 L.Ed. 502, the court said: "But agreements or combinations between dealers, having for their sole purpose the destruction of competition and the fixing of prices, are injurious to the public interest and void."

Again, in Addyston Pipe & Steel Co. v. United States, supra, in discussing the purpose of the combination under consideration, the court, on page 240 of 175 U. S., 20 S.Ct. on page 107, 44 L.Ed. 136, said: "* * * and by means of such combination increase the price for which all contracts for the delivery of pipe within the

territory above described should be made, and the latter result was to be achieved by abolishing all competition between the parties to the combination."

Likewise, in Swift & Company v. United States, supra, the court on page 400 of 196 U.S., 25 S.Ct. on page 281, 49 L.Ed. 518, said: "* * * The thing done and intended to be done is perfectly definite: with the purpose mentioned, directing the defendants' agents and inducing each other to refrain from competition in bids. The defendants cannot be ordered to compete, but they properly can be forbidden to give directions or to make agreements not to compete."

As already stated, we are. unable to agree with the contention of the Government that the instant case involves a price fixing agreement unlawful per se. It does not follow, however, that appellants' contention is sound that the court erred in its refusal to direct a· verdict under the authority of Appalachian Coals, Inc., v. United·States, supra. While such contention finds support in that case, we do not think the reasoning therein, when applied here, goes to the extent of requiring a directed verdict. It must not be overlooked that in that case the combination had not been placed in operation. It is evident that the court, in evaluating the effect which the plan would have upon competition, was dealing to a considerable extent in prophecy rather than in actual results produced when and if the plan became operative. The court, on page 377 of 288 U.S., 53 S.Ct. on page 480, 77 L.Ed. 825, said: "* * * We recognize, however, that the case has been tried in advance of the operation of defendants' plan, and that it has been necessary to test that plan with reference to purposes and anticipated consequences without the advantage of the demonstrations of experience. If in actual operation it should prove to be an undue restraint upon interstate commerce, if it should appear that the plan is used to the impairment of fair competitive opportunities, the decision upon the present record should not preclude the Government from seeking the remedy which would be suited to such a state of facts." In other words, it is plain that the court left open to the Government the right to initiate further proceedings if the plan in operation resulted in the "impairment of fair competitive opportunities." Under such circumstances, we do not think it could be

seriously contended but that the nature of the restraint would have to be determined as a matter of fact as distinguished from a restraint unlawful as a matter of law, and that this determination would be made from the effect which the plan in operation had upon competition in the open market.

In the instant case, not only the assailed combination, together with its objectives, but the result of its operation for a period of almost two years, was before the court. Therefore, it is idle to argue merely as to what was intended by the plan when its operations are disclosed. Its effect upon fair competition, and consequently the question as to whether it constituted an unreasonable restraint of trade, were questions of fact which the court was justified in submitting to the jury for determination. In other words, the restraint imposed was neither lawful nor unlawful per se, but its character was one of fact to be decided by a jury.

The case was submitted to the jury upon the theory that the combination charged was unlawful per se. This, in our judgment, was error such as to require a reversal. Under such circumstances, it ordinarily would serve no useful purpose to enter into a discussion of the evidence as it relates to the character of the restraint imposed. We think it is pertinent, however, to make brief reference to the contentions of the respective parties in this respect by way of demonstrating that the character of the restraint was a jury question and not one to be declared unlawful per se.

Our understanding of the position of the Government is that competition was destroyed or suppressed on the "spot" tank-car market. The Government's position is thus stated: "The agreement on the part of major companies to purchase gasoline from independent refiners, not competitively and not on the basis of the best price obtainable and not on the basis of purchasing from the concern or concerns whose product best met the purchaser's needs, eliminated price competition among the parties thereto just as effectively and fully as any agreement to sell at uniform minimum prices."

This conclusion, in our judgment, can not be sustained inasmuch as the buying programs complained of included only about one-third of the gasoline sold on the "spot" market. It would seem that the buying programs actually increased competition among the buyers on that market. No doubt, however, the test should be the effect had upon competition between the sellers and the buyers. Assuming, but not deciding, that competition between the sellers and those engaged in the buying programs destroyed competition as to the one-third of the sales made, there yet remained the two-thirds not involved in the program which was sold on the market as had theretofore been done. Removing the one-third involved in the buying programs, there remained, theoretically at least, and factually so far as the record discloses, a supply equal to the demand. Under such circumstances, it can not be held that competition on the "spot" market was eliminated. The most that can be said is that the buying programs had an effect on competition, and whether that effect was such as to produce an unreasonable restraint upon commerce, was one of fact. It is argued by the Government that inasmuch as the defendants had knowledge of the amount of gasoline which would be purchased by those not connected with the concerted effort, they were enabled to raise and control the price as effectively as though they had purchased all, or substantially all, of the gasoline offered on the "spot" market. We do not believe this argument is sound. If so, it means that the power or control exercised by all of those engaged in an industry may be included in determining whether a combination of some of its members, perhaps a minority, is possessed with the power to raise and control prices. If such an argument is to be countenanced, then those controlling a relatively small portion of an industry could be charged and convicted with a price fixing arrangement illegal per se. As pointed out both in the Trenton Potteries case and the Appalachian Coals case, it is the combination of those controlling a substantial part of an industry from which the power arises to control prices, but as heretofore stated, where the plan of the concerted effort is placed in operation, we think the situation must be judged largely by its effect.

That the defendants had the power to and did control prices is evidenced as the Government argues, principally by the marked increase in the price of gasoline during the earlier months of 1935, and the "unprecedented rigidity of price beginning

in June, 1935 and continuing throughout the remainder of the year." On its face, this is a rather convincing circumstance, but when considered in connection with other circumstances, it is not so convincing and certainly not conclusive. For instance, the passage of the Connally Act, which went into effect in February, 1935, undoubtedly played a prominent part in the increase and maintenance of the price level. At any rate, it is disclosed that in prior instances, where the transportation of "hot oil" was prohibited, a similar increase in prices was experienced. Another circumstance which militates against the importance of the rigidity of the price level is the fact that the price of gasoline outside the Mid-Western area was actually higher during the indictment period than it was within. It also is worthy of note that the price to which it is claimed to have been arbitrarily raised and maintained was at no time above that which was regarded by the Government and industry, as a parity price.

In United States v. U. S. Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121, the court found occasion to comment upon the testimony of certain witnesses concerning the importance of price rigidity. On page 448 of 251 U.S., 40 S. Ct. on page 298, 64 L.Ed. 343, 8 A.L.R. 1121, it is said: "* * * His deduction was that, when prices are constant through a definite period, an artificial influence is indicated; if they vary during such a period, it is a consequence of competitive conditions. It has become an aphorism that there is danger of deception in generalities, and in a case of this importance we should have something surer for judgment than speculation, something more than a deduction, equivocal of itself, even though the facts it rests on or asserts were not contradicted. If the phenomena of production and prices were as easily resolved as the witness implied, much discussion and much literature have been wasted, and some of the problems that are now distracting the world would be given composing solution. Of course, competition affects prices; but it is only one among other influences, and does not, more than they, register itself in definite and legible effect."

There are other factors which it is argued entered into the increase in the price level of gasoline. It is pointed out that at the time of the marked increase in the price of gasoline there was likewise a marked increase in commodity prices in general and that at least a part of the increase is attributable to natural causes. It is disclosed that there are many large refiners outside the Mid-Western area but so near the territory that the product is readily obtainable. In many cases the freight rate from these outside refiners to important points within the territory is actually less than from refiners located within the territory. We shall not relate the details of this situation, but it is argued, not without logic, that potential competition from outside the territory would preclude the raising of prices within the territory to high and arbitrary levels.

■■■ It is not within our province to decide the effect, if any, which the buying programs had upon competition in the "spot" market, or upon the restraint of commerce, and the circumstances just discussed are not for such purpose. They are cited in emphasis of our conclusion that the effect upon competition and trade produced by the programs in operation was a factual one with plenty of meritorious argument both pro and con. Thus the situation refutes the idea that the combination was unlawful per se and reinforces our conclusion that it was a case which should have been submitted to the jury for the purpose of deciding whether the restraint involved was reasonable or otherwise.

■■■ Another question which is somewhat related to the basic one we have been considering is the allegation in the indictment that the independent refiners, at the instance of certain of the defendants, curtailed their production of gasoline. We are unable to find any competent evidence that the curtailment of production was a part of the plan for concerted action either in its formation or operation. The Government, in support of this allegation, says: "The record shows that throughout the conspiracy period, efforts were made to induce the independent refiners to curtail their gasoline production, and that after the expiration of the refinery allocation system under the code, allocation of production was continued through the defendant Boggs." We find nothing which connects the appellants in any way with any activities on the part of Boggs in this respect. The court directed a verdict of acquittal as to Boggs. Thus, he was not shown to have been a party to or connect-

ed with the alleged conspiracy. Under such circumstances, we know of no rule by which activities on his part could be charged to, or considered as evidence against, the defendants. A number of exhibits are cited in support of the quotation above. They have been examined carefully and we do not think they contain any evidence properly to be considered against the defendants. They consist largely of market letters signed by persons not shown to be members of the alleged conspiracy, in which the hope or opinion is expressed that production be reduced. One of such letters is signed by W. T. Atkins and addressed to J. F. Nagle. (Nagle also was acquitted by direction of the court.) The letter states: "I had hoped that this refinery's runs might be reduced in line with the Program Committee." It is not disclosed who was meant by Program Committee. These market letters are referred to as "inter-office correspondence." They were published weekly and contained mostly the "gossip" of the trade. A number of them are signed by J. W. Warner and addressed to J. D. Collins, neither of whom was shown to have authority to speak for any of the defendants, but even if he had, such statements as are found in these letters merely represent the opinion, or conjecture, of the writer. Typical of such statements are:

"Marketers in general are advocating a further reduction in gasoline production.

"Many of the plants that are overloaded with gasoline stocks have cut down on operations to half capacity or are operating periodically until demand freely absorbs the present production.

"Suppliers of gasoline throughout the refining districts realize the necessity of keeping gasoline production at conservative levels.

"Reports indicate that the majority of refiners are still adhering to the allocated refinery operations in an effort to keep gasoline production in balance with demand."

So far as we are able to determine, it is just as reasonable to conclude that these expressions of opinion, hope and conjecture had reference to a continuation of the policy of the Government in reducing production as that they refer to any plan or effort on the part of the defendants. In any event they are incompetent and prove nothing.

Another market letter to which our attention is called is signed by P. E. Lakin, one of the appellants. The letter contains this statement: "* * * if such refiners hold their runs down to levels in line with a figure recommended by a responsible 'fact-finding' body, the future out-look is bright. Current indications are, that Independent Refiners with few exceptions, will, in view of their experience during N.R.A., conform to a policy of holding crude runs down to market demand."

The question as to whether this statement has reference to the program of the defendants is one purely of speculation. We recognize the broad rule generally followed regarding the admissibility of testimony on a conspiracy charge. That the acts and statements of each member of a conspiracy performed or made in the execution of the conspiracy, are admissible against all, is a rule well established. No one of the statements referred to comes within this rule or any other rule of which we are cognizant.

From what we have said up to this point, it is apparent that this cause must be reversed. For this reason, and for the additional one that the views already expressed have a direct bearing upon many of the specific questions presented, it will not be necessary, in considering the same, to go into detail such as we otherwise would. We shall take them up, however, in numerical order as heretofore set forth.

Contested Issues I and II may be considered together. The former has to do with the failure of proof to sustain what is argued to be an essential allegation of the indictment, and the latter with a variance between the charge and the issues on which the case was permitted to go to the jury. The allegation of the indictment referred to is Paragraph 24 entitled "Participation of Market Journals." It alleges that the trade journals named in the indictment "have intentionally and wrongfully engaged and participated in the combination and conspiracy set forth in this indictment, and have directly and materially aided the other defendants in effectuating the same, and the unlawful purposes and effects thereof set forth in this indictment." These journals are charged with being the chief agencies and instrumentalities through which the arti-

ficially raised and fixed prices of gasoline paid by the major oil companies have affected the price paid by jobbers and others in the indictment territory. They are charged with having published the price paid by the major oil companies as the price paid by jobbers in the "spot" market, intending that such prices would be relied upon by the jobbers in determining the prices to be paid to the major companies in conformity with the contracts existing between the jobbers and the major companies. The Government, at the conclusion of the presentation of its case, conceded that the testimony adduced was insufficient to support the charge as to these trade journals, and the case as to them was dismissed.

It is argued by appellants that this paragraph of the indictment alleges the means and only means by which the conspiracy charged was to be carried into effect. We do not agree with this argument. As we read the indictment, it states a completed charge against the defendants (other than the trade journals) including the means by which the conspiracy was to be carried into effect, preceding the paragraph with reference to the trade journals. Prior to this paragraph the trade journals had not been connected with the conspiracy and that paragraph evidently was for that purpose. It is in the nature of an additional count specifically charging the trade journals. Without it they were not involved, but it does not follow that it was essential in charging the other defendants.

Paragraph 18 defines the conspiracy. It is alleged that the defendants conspired for the purpose of "artificially raising and fixing the tank-car price of gasoline in the 'spot' market," and that they "artificially raised and fixed said 'spot' market tank-car price of gasoline and have maintained said prices at artificially high and non-competitive levels," in violation of the Sherman Anti-Trust Act. The indictment, prior thereto, had in great detail defined "spot" markets—how prices thereon were determined, and the manner in which the price paid by the jobber and retailer was determined with reference to the "spot" market. Paragraph 19 commences: "Said unlawful combination and conspiracy has been effectuated in the following manner 'and by the following means." Then follows a detailed description of the two buying programs with the allegation that the purchases in said program were made

at "uniform, high, arbitrary and non-competitive prices." The buying programs are the means alleged to have effectuated the conspiracy. Both the conspiracy and the means alleged precede Paragraph 24 wherein it is sought to connect the trade journals with the conspiracy in a manner similar to that of aiders and abettors. Most of appellants' argument under this point proceeds upon the theory that the paragraph with reference to trade journals describes the only means by which the conspiracy was to be effectuated. Inasmuch as we think this contention is not tenable, we shall not discuss what might be the situation if no other means were alleged.

The argument presented under Contested Issue II with reference to a variance rests upon a similar basis. It is said that the indictment, including the paragraph with reference to the trade journals, charges a price fixing agreement. In other words, the appellants are charged with buying at an agreed price, to be falsely published in the trade journal as the market price, and upon this false price as published, the price to the jobber and retailer was determined. It is argued that the Government, when it failed to make a case against the trade journals, shifted its position and proceeded upon the theory that the activities of the defendants merely affected the prices. Appellants state the situation thus: "The fundamental difference between fixing the market price and merely affecting the market price is such as to preclude a showing of the latter as a substitute for a charge of the former." This statement really contains the gist of appellants' argument on the question of variance.

As we understand appellants' position in this respect, it is that the indictment, including the paragraph with reference to the trade journals, charges a price fixing agreement, and when the Government failed to substantiate that paragraph of the indictment, it necessarily followed that no price fixing agreement was proven but that instead, the proof disclosed an agreement merely affecting the market prices, and that proof of the latter would not susbtantiate a charge of the former. The Government, on the other hand, contends that, ignoring the paragraph with reference to the trade journals, the indictment alleges a price fixing agreement, and argues that a price fixing agreement was

proven. The argument again revolves largely around the decisions of the court in United States v. Trenton Potteries Company, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825. We have heretofore concluded that the Government failed to prove a price fixing agreement such as is disclosed in the Trenton Potteries case. We also think there has been too much importance attached to the terms "price fixing" and "price affecting," and that the true test to be employed in determining whether an agreement is unlawful per se or one in which the character of restraint is open to investigation, must depend upon the effect had upon competition with its resultant effect upon trade. If competition is suppressed or destroyed, the agreement comes within the former class; if not, within the latter. We shall not repeat what we have heretofore said in this respect. It is sufficient here to point out that the distinction has to do with the proof rather than the charge. If a combination has power to destroy competition, no further evidence is required. If it does not, then all relevant evidence should be received and considered in determining whether competition has been interfered with to the extent of constituting an undue restraint. It is not necessary for us to determine whether the indictment charges an agreement unlawful per se, but answering the question now before us, we assume that it does. That being so, we have no doubt but that proof of an agreement not unlawful per se is sufficient to sustain the charge. The fallacy in appellants' argument rests in the unwarranted premise that two offenses are involved, whereas such is not the case. The statute defines the one offense of "restraint of commerce." The courts have not created two offenses where only one is created by statute, but have classified the offense with respect to the quantum of proof required. In one class, proof of the combination with power to destroy competition is sufficient as a matter of law, while in the other, proof is required as to whether the effect upon competition is such as to constitute an unreasonable restraint.

Contested Issue III. It is argued under this point that the court committed reversible error in its refusal to allow appellants' motion for a directed verdict. Appellants' position is stated thus:

"(1) Forced sales of a distress product which contribute substantially to the depressed condition of an industry constitute a competitive evil.

"(2) An intention 'to stabilize the business, or to produce fairer price levels,' through the elimination from a competitive market of a competitive evil (such as distress gasoline) is not unlawful.

"(3) An effort to correct such a competitive abuse is promotive of sound competition and not condemned by the law unless by reason of its intent, inherent nature or effect it goes beyond the restraint on competition involved in any removal of the competitive evil and unreasonably restrains competition in some other manner than the removal of the abuse."

On the other hand, the Government contends that—"A combination to fix, raise, or control the market price of a commodity when those who combine possess the power to fix, raise, or control market price is the most important and conspicuous example of this type of restraint. Where a restraint of this kind is established, no question of reasonableness is open for determination by either court or jury."

Again the argument is predicated largely upon the Appalachian Coals case and the Trenton Potteries case. We have held neither case controlling here. It is true in the former case that the court held the "[plan] would have a tendency to stabilize market prices and to raise them to a higher level than would otherwise obtain." It also stated that the evidence failed to show that "any effect will be produced which in the circumstances of this industry will be detrimental to fair competition." As we have pointed out, however, the court there was dealing with a plan which had not been placed in operation. Here we are considering a plan placed in operation with the results revealed. Under these circumstances, it was a jury question as to the effect which the plan in operation had upon fair competition and its resultant effect upon restraint of trade. It may be as pointed out by Justice Harlan in his dissenting opinion in Standard Oil Co. v. United States, 221 U. S. 1, 97, 31 S.Ct. 502, 530, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, that the submission of such a question is calculated to render the statute indefinite and uncertain. He said: " * * * *the in-*

*jection of the rule of reasonableness or unreasonableness would lead to the greatest variableness and uncertainty in the enforcement of the law. The defense of reasonable restraint would be made in every case, and there would be as many different rules of reasonableness as cases, courts, and juries.* What one court or jury might deem unreasonable another court or jury might deem reasonable. A court or jury in Ohio might find a given agreement or combination reasonable, while a court and jury in Wisconsin might find the same agreement and combination unreasonable." Nevertheless, the decisions of the Supreme Court, heretofore discussed, leave no doubt, in our opinion, that the case was one requiring submission to the jury.

Contested Issue IV. This point has to do with the court's charge to the jury, as well as its refusal to instruct in numerous particulars as requested by the appellants. We shall not endeavor to give even a synopsis of the charge which, as might be expected, was of great length. Rather, we shall state appellants' contention, followed by certain admissions made by the Government with reference to the nature of the charge. Appellants' contention may be summarized thus:

"(1) The Court committed prejudicial error by instructing the jury that it was to consider the reasonableness of the defendants' acts, and the facts and circumstances surrounding them, only if it first found (a) that the defendants did not have the power to raise the level of spot market prices, or (b) that they did not combine for that purpose, and (c) that their purchases affected the spot market prices only indirectly and incidentally.

"(2) The Court committed prejudicial error by instructing the jury that an agreement embracing or involving the raising (as distinguished from the fixing) of the price of a commodity by a group controlling a substantial part of the trade in such commodity is illegal per se.

The Government concedes that the cause was submitted to the jury upon the theory that the condemned agreement was unlawful per se. It states: "These instructions, like those in the Trenton Potteries case, withdrew from the jury any further question as to the illegality or unreasonableness of the restraint and, as in the Trenton Potteries case, refusal to grant instructions setting forth tests which, in a

different situation or with a different kind of combination, might be applicable in distinguishing between a reasonable and an unreasonable restraint of trade, was not error."

The theory upon which the case was submitted to the jury is further illustrated by the following statement by the Government:

"The court repeatedly and explicitly instructed the jury as to the circumstances which would justify a verdict of guilty. These circumstances were that the jury find (1) that the defendants had the power to raise gasoline prices and (2) that they had combined for this purpose as charged in the indictment. The court charged:

"If you find that the defendants, and those acting in concert with them, controlled the greater part of the gasoline sold in the ten Middle Western States, and had the power to raise the price of that gasoline, and that the defendants and these other persons acting with them have knowingly engaged in a combination to raise or fix the price to be charged for gasoline to jobbers or consumers in the Mid-Western area as charged in the indictment, then you will understand that these defendants have violated the Sherman Act and are guilty as charged in the indictment.

"The court, in repeating the substance of this instruction, charged the jury that if the defendants had the power, and combined for the purpose of raising the level of spot market prices, then 'the restraint of trade was as a matter of law undue and unreasonable and, therefore, illegal.' "

Thus, it is apparent that the court's charge involves the same fallacy as that which runs throughout the case. The court subscribed to the theory urged by the Government that the agreement proven constituted a restraint unlawful per se. We have already decided to the contrary. Since the case is one which should have been submitted to the jury solely upon the issue of the character of the restraint imposed, as we have concluded, it necessarily follows that the court's charge, embracing a theory which we conclude is inapplicable, is reversible error.

Contested Issue V. We shall only make general reference to the proferred testimony which appellants argue the court erroneously refused to admit. Appellants place the refused testimony in three classes, as follows:

"(1) '* * * the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; * * * The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained * * *'

"(2) Offers to prove facts showing that the Federal Petroleum Administration encouraged and cooperated with the defendants in the activities for which they were convicted, as bearing upon 'the purpose or end sought to be attained.'

"(3) Offers to prove facts showing 'the nature of the restraint and its effect,' and specifically the fact that the prices of gasoline in the southwesteren tank-car markets and in the Mid-Western area were not artificially high and non-competitive during the indictment period."

Objection to this testimony was made by the Government and sustained by the court largely upon the theory that "the unreasonableness of the restraint" was not in issue. No doubt if the case had been tried upon that theory, as we think it should have been, the ruling of the court with reference to the admission of much of this testimony would have been different. The rule as to evidence proper to be considered, where the reasonableness of the restraint is in issue, is clearly announced in Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, Ann.Cas. 1918D, 1207. There it is stated: "* * * To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."

Under the authority of United States v. U. S. Steel Corp., 251 U.S. 417, 446, 447, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L. R. 1121, and Fosburgh v. California & Hawaiian Sugar Refining Co., 9 Cir., 291 F. 29, 36, 37, it would seem that evidence otherwise competent, which would show cooperation with the defendants on the part of Government officials, either in approval or in carrying out the program in question, should be admitted. This class of testimony was not offered to show immunity, but as bearing upon the purposes and objectives of the defendants, and as such, had a bearing, we think, upon the issue which should have been submitted to the jury. The argument of the Government that this class of evidence should be excluded, because it was calculated to confuse the jury, is not tenable. The test is its relevancy to the issue. We think it is true, as argued by the Government, that much of the refused testimony was of a cumulative nature. At any rate there certainly is much testimony in the record relative to the history of the oil industry, the evils with which it was beset, and efforts made by the industry and various Governmental agencies, Federal and State, to alleviate the situation. The trial court necessarily must be vested with a large amount of discretion in a situation of this kind. After all, even a conspiracy trial can not go on forever.

The defendants were charged with raising the price of gasoline on the "spot" market and in the Mid-Western area at an artificially high and non-competitive level, and any evidence disproving or directly tending to disprove that allegation should have been received.

Contested Issue VI. Under this issue it is argued that the court was without jurisdiction. The Sixth Amendment to the Constitution, U.S.C.A., provides for a trial "by an impartial jury of the State and district where the crime shall have been committed."

Appellants concede, properly we think, that the court would have jurisdiction if (a) the evidence established that the conspiracy in violation of the Sherman Act was entered into within the Western District of Wisconsin, or if (b) the evidence established that someone or more of the defendants or of their co-conspirators committed an overt act pursuant to the conspiracy within the Western District of Wisconsin. There is no proof establishing jurisdiction under "a" so if it is found, it must be under "b." We also accept appellants' two tests for determining whether an act is overt, viz.: (1) Was the act in pursuance of the conspiracy?; and (2) Did the act tend to achieve and advance the objects of the conspiracy? As we understand appellants' contention, it is to the effect that the indictment contains no charge that the defendants agreed to make any contract in Wisconsin, nor that

834

they had any agreement with reference thereto, and that what each defendant did in Wisconsin was a matter of individual determination without regard to any term or obligation of any agreement. In other words, that the acts relied upon by the Government as overt, were the acts of defendants acting in their individual capacities and not for or as representative of those engaged in concerted action. Such being the situation, so it is argued, the acts committed in Wisconsin were neither in pursuance of nor tended to achieve and advance the objects of the conspiracy. This argument, in our opinion, is predicated upon the false premise that the sole purpose of the conspiracy, as charged, was the raising of the price of gasoline on the "spot" market. The indictment, after the allegation · with reference to the "spot" market, continues "and have thereby intentionally increased and fixed the tank-car prices of gasoline contracted to . be sold and sold in interstate commerce as aforesaid in the Mid-Western area (including the ·Western District of Wisconsin)." In each of the buying programs described in the indictment, it is alleged "as agreed upon by said defendant major oil companies, all with the unlawful purposes and effects aforementioned." It would seem rather plain that among the "purposes and effects" was one designed to ʻraise the price of gasoline in the Mid-Western area, as well as on the "spot" market. Assuming, as appellants contend, that there was no evidence as to any statements or acts at any of the meetings wherein the concerted action was agreed to, with reference to sales within the Mid-Western area, or with reference to prices at any place other than on the "spot" market, we still think the conclusion is irresistible that it was a part of the plan to increase the price in the territory wherein their gasoline was sold. We do not think it can be said that their sole object was the stabilizing or raising of the "spot" market price. That was one object. The other, and perhaps of greater importance to the defendants, was to increase the price in the territory in which their gasoline was sold. Even though there be no direct evidence in proof of this second objective, all the circumstances point irresistibly to that conclusion. To think differently would be the equivalent of believing that the defendants were engaged in a philanthropic endeavor. Otherwise, what could be their purpose or objective in increasing the price on the "spot" market?

They were buyers on that market and an increase in price would be to their disadvantage. Advantage to them, if any, could come only through an increase in price in the territory in which they expected to and did sell, including the Western District of Wisconsin. To say the object of the concerted action was to raise the price on the "spot" market without, at the same time, saying that there was a further objective—the increase of the sales price to their customers—would be illogical and contrary to common sense.

In the Trenton Potteries case the defendants were tried ʻin a district other than that in which the conspiracy originated. The court, in discussing the question of jurisdiction, said: "* * * The record is replete with the evidence of witnesses for both prosecution and defense, including some of the accused, who testified without contradiction to the course of business within the district, the circulation of price bulletins, and the ·making of sales there by some of the members of the association organized by respondents. The secretary testified that, acting for the association, he effected sales within the district. All of these were overt acts sufficient for jurisdictional requirements."

Appellants distinguish that case from the present one, thus: "In that case, the sales at a set price were required by the very terms of the agreement and were acts which directly carried out the obligation of the agreement. Here the only obligations created by the agreement related to what was to be done in the buying of gasoline from the non-integrated refiners and in the restraining of competition in the spot tank-car market." The fallacy of this distinction is that it ignores the object and purpose of the concerted action in the instant case. If the object of defendants' concerted action was to increase the price of gasoline in the Mid-Western area (including the Western District of Wisconsin) and that objective was accomplished by sales at such increased price, it is our conclusion that under the decision in the Trenton Potteries case, such sales would constitute overt acts.

We shall not discuss the numerous authorities cited by appellants under this point. It is sufficient to say that we have read them and do not believe they are even persuasive, certainly not controlling. We, therefore, conclude that the District Court had jurisdiction.

■ Contested Issue VII. It is argued under this point that the court erred in the admission of evidence. More than 650 exhibits were introduced, three-fourths of which were offered by the Government. It would be surprising if some error was not committed in passing upon the admissibility of such a volume of exhibits. To enter into a discussion of the various errors assigned in this respect would unduly extend this opinion, which even now is quite long. The documents objected to consist largely of letters, telegrams and market reports obtained from the files of the defendants and referred to in a general way as "inter-office communications"; that is, communications from one officer or employee to another officer or employee of the same corporation. In the main, they charge (1) that the defendants induced the independent refiners to curtail production, (2) that the buying programs were for the purpose of restoring the price of gasoline, (3) that, after the rise of the market price of gasoline, the buying programs were utilized in preventing the dumping of "distress gasoline" on the market, and (4) that the employees of certain companies regarded the amount of "distress gasoline" which they had been asked to purchase by members of the Tank-car Stabilization Committee, as "their share," "allocated" or as "assigned" to them and that the companies were obligated to make such purchases. Heretofore we have discussed the evidence by which it was sought to prove the curtailment of the production of gasoline, and found there was no competent evidence in support of the charge. We understand that appellants concede that the concerted effort, resulting in the buying programs, was for the purpose of restoring the price of gasoline and for the purpose of preventing the "distress gasoline" from being dumped upon the market. We do not think appellants now are in a position to complain of evidence, even though improperly admitted, which proved or tended to prove that which is now conceded. What we have said heretofore concerning the evidence relied upon by the Government to prove the charge of curtailed production is largely applicable to the testimony concerning allocation and obligation to buy "distress gasoline." A review of the exhibits leads us to think that in some instances the statements contained therein merely represented the opinion of an employee. In other instances statements were made by an employee not shown to be a member of the conspiracy and not shown to have any authority to speak. We are convinced, however, that any error committed in this respect could not have affected the result of the trial.

Contested Issue VIII. Under this point it is urged that the court erred in denying the several motions of appellants for a new trial. The Government contends that under the authority of Fairmount Glass Works v. Cub Fork Coal Co., et al., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439, we are without authority to review the action of the District Court in this respect. Under the theory upon which the case was submitted to the jury, the power to raise prices arbitrarily and artificially was an important element of the case. By the verdict of guilty, the jury found that issue in favor of the Government. When the case was submitted there was included among the defendants, the Standard Oil Company of Indiana (and others not here important). The indictment alleged: "Said area comprises the gasoline market territory of defendant Standard of Indiana, and is sometimes known as the Standard of Indiana territory by reason of defendant's dominant position in the distribution of gasoline in each of said states." It was the largest company doing business in the Mid-Western area, and as such was the price leader. During the indictment period its business amounted to about 25% of the total. It purchased from the independent refiners from 6% to 10% of the gasoline sold by them. After the verdict of guilty as to all the defendants, including the Standard, the court allowed a motion for a new trial as to the latter. It is argued by appellants that the power found by the jury included that possessed by the Standard. That, therefore, there has been no finding by the jury that the appellants possessed the requisite power. The question becomes one as to whether the Standard was a partner in the alleged conspiracy or an adversary engaged in competition. Thus an important legal question is presented.

■ Under the circumstances, however, we need not determine either our authority or the merits of the question for the reason that it has become moot because the case must be reversed upon other grounds.

■ Contested Issue IX. The essential error alleged under this point concerns the manner in which the Grand Jury testimony was used during the trial. The witnesses of the Government were largely employees

and officers of the defendants. Upon the basis that the witnesses were hostile or unfriendly, counsel for the Government read extensively to numerous witnesses what purported to be their testimony given before the Grand Jury for the purpose, so it is claimed, of refreshing their memory. Some idea is gained of the extent to which this practice was employed by appellants' statement (not disputed by the Government) that uncertified Grand Jury minutes were read or referred to on approximately ninety occasions and more than one thousand lines of the transcript of the record consist of verbatim quotations from those minutes. They were read to the witness in the presence of the jury and, although defendants repeatedly made requests for the privilege of inspecting and examining such minutes, their request in each instance was denied; nor was the witness permitted to see or examine them. It was the theory of the Government during the trial, persisted in here, that by keeping the minutes out of the hands of the witness, an inspection of the same by the defendants could be prevented. The Government argues that: "A distinction must be made between the use of a prior statement to refresh recollection and its use for impeachment and between its use to refresh recollection and its use as affirmative evidence where present recollection cannot be revived."

For the purpose of this discussion, we shall accept the Government's contention that the Grand Jury minutes were used solely for the purpose of refreshing the recollection of the witness. It follows that there is no occasion for us to determine the validity of the distinction as pointed out by the Government, or what the rule as to inspection might be under other circumstances.

That the procedure employed was erroneous, we think, is borne out by the great weight of authority; and that it was unfair and prejudicial, we have no doubt. The suggestion that the testimony given by the witnesses in each instance was the same as that read to him from the minutes of his Grand Jury testimony, thus reinforcing the testimony given by the witness and thereby being advantageous to the defendants, is devoid of merit.

Notwithstanding the repeated practice in the procedure complained of, the Government now states: "* * * not a single item of testimony given by any witness which (1) was elicited by stimulating recollection by calling the witness' attention to his grand jury testimony and (2) was not covered by the testimony of the witness otherwise given." According to this admission, it would seem that the effort to refresh the recollection of the witnesses was a complete failure. Nor does this admission minimize the harm calculated to result from such procedure.

While the use of the testimony in such manner was erroneous, the damaging effect was its use in connection with statements made by counsel for the Government in which it was repeatedly insinuated, if not actually charged, that the witness was deliberately testifying falsely. It is difficult to believe that the jury could have received any other impression. The jury was told in the opening statement of counsel for the Government that certain witnesses for the Government, because of their connections with the defendants, would testify "under the greatest stress and because he finds no other way out." During the examination of one witness, counsel made this statement: "Your Honor, the Government is distinctly surprised by this testimony, which is in direct contradiction to testimony given before the Grand Jury; and the Government asks permission to lead this witness, and to confront him with his Grand Jury testimony for the purpose of refreshing his recollection." We set forth a few of the typical comments made by the Government in connection with the use of such testimony.[9]

9 "We declare to the Court now that we are frankly surprised at the answer of this witness, and we have very good reasons for that surprise, which we will assert if permitted to do so.

"Your Honor, the Government is distinctly surprised by this testimony, which is in direct contradiction to testimony given before the grand jury; and the Government asks permission to lead this witness, and to confront him with his grand jury testimony for the purpose of refreshing his recollection.

"The Government is not satisfied with that answer, and is still completely surprised, and I would like to cross-examine the witness.

"And were those answers true when you gave them in response to those questions?

"Well is that correct testimony?

"How do you reconcile that with the testimony you say you remember you gave before the Grand Jury?

"And were those answers true when you gave them * * * ?

"He does not now admit that he talked

As we are only considering the proper procedure where the testimony is used for the purpose of refreshing the memory of the witness, or as counsel put it, "to revive a flagging memory," we shall only refer to authorities applicable thereto.

In Morris v. United States, 5 Cir., 149 F. 123, 9 Ann.Cas. 558, the court had before it a situation similar to the present one, except that the written memorandum from which the witness refreshed his memory was shown to him. The court on page 126 of 149 F., said: "* * * We understand it to be the universal rule of evidence in the courts of this country that, where a witness is permitted to examine and refresh his recollection with a paper, it is to be tendered to the other side for inspection just as soon as it has been identified."

In Lennon v. United States, 8 Cir., 20 F.2d 490, the witness had refreshed his recollection the day before the trial by reading a written memorandum, and the court held that inasmuch as the refreshing material had not been produced in court, the opposing party was not entitled to an inspection thereof. The court said, on page 494 of 20 F.2d: "* * * It is only where the witness uses the paper to refresh his memory while on the stand that there exists a right to compel the production of the writing for inspection." (Citing cases.)

In Little v. United States, 8 Cir., 93 F. 2d 401, on page 406, the court said: "It is a generally accepted rule of evidence that the defendant in a criminal case or his counsel has the right, upon proper request or demand, to inspect and use, for purposes of cross-examination, any paper or memorandum which is used by a witness on direct examination for the purpose of refreshing his present recollection.".

Wigmore on Evidence, Volume 1, Section 762, announces a similar rule. The reason therefor follows: "Furthermore, as by having an opportunity of inspection the opponent is guarded against imposition clearly apparent, so by cross-examination based on the paper he may further detect

circumstances not appearing on the surface, and may expose all that detracts from the weight of testimony." With reference to some decisions holding to the contrary, it states: "These decisions, however, are in a small minority, and have no principle to support them." Contrary to the rule announced in Lennon v. United States, supra, the author states that the rule should apply even where the memorandum was consulted before trial and not brought by the witness into court. The Government argues, without logic we think, and with little, if any, authoritative support, that the rule, as announced, is only to be applied to documents used by the witness while on the stand. Apparently the trial court was of the same opinion. In fact, the purpose of reading the minutes to the witness, rather than placing them in his hands, was to circumvent the application of the rule. The cases cited in support of the Government's theory are not convincing—in fact, they are not in point.

In Mullaney v. United States, 9 Cir., 82 F.2d 638, the court sustained the refusal of the trial court to permit opposing counsel to inspect a memorandum, but as the court points out, the memorandum was not used or referred to by the witness.

In Metzler v. United States, 9 Cir., 64 F.2d 203, opposing counsel was refused the right to inspect the Grand Jury testimony in the hands of the prosecuting attorney, but there the witness had refreshed his memory, not from the Grand Jury minutes but from notes personally made while before the Grand Jury.

In Brownlow v. United States, 9 Cir., 8 F.2d 711, a prohibition agent had refreshed his memory by reference to a memorandum book. Opposing counsel demanded possession of the book. It was held that counsel was entitled only to that portion of the book pertaining to his testimony and not to other parts which had no connection therewith.

■ Many cases are cited[10] by the Government to the effect that it is within the judicial discretion of the trial court to per-

---

with him. I have read the minutes, and he denies that, and denies—his denial is in direct conflict with what I read from the minutes.

"Was it clear in your mind when you testified before the grand jury?

"Do you mean to say that you did not give that testimony before the grand jury?"

[10] Bosselman v. United States, 2 Cir., 239 F. 82, 85; Felder v. United States, 2 Cir., 9 F.2d 872, 874; United States v. Freundlich, 2 Cir., 95 F.2d 376, 379; Buckley v. United States, 6 Cir., 33 F. 2d 713, 717; Levy v. United States, 8 Cir., 35 F.2d 483, 484, 485; United States v. Lonardo, 2 Cir., 67 F.2d 883, 884; Bedell v. United States, 63 App.D.C. 31, 68 F.2d 776, 777, 778.

mit counsel to endeavor to refresh the recollection of a hostile witness by calling attention to his testimony given before the Grand Jury, or to other prior statements. So far as we are aware, there is not a single authority to the effect that opposing counsel, upon request, is not entitled to examine and inspect any document or memorandum used by a witness in court for the purpose of refreshing his recollection. That the rule can be avoided by the simple expedient of reading to the witness the memorandum has no basis in law or logic. In fact, there is more reason for permitting inspection by opposing counsel in the latter situation than in the former, where at least the witness is given an opportunity to check upon that which is being used to refresh his memory.

Contested Issue X. The error urged under this point is predicated upon the alleged improper and prejudicial argument made to the jury by Government attorneys. It is contended that counsel, in urging a conviction, appealed to class prejudice, advised the jury as to counsel's personal opinion, informed the jury that it was the wish and desire of the highest officials in the Government of the United States that the defendants be convicted, and related to the jury the personal knowledge of counsel. in contradiction of and in discrediting an important defense witness. A recitation of those portions of the argument complained of and set forth in appellants' brief would unduly prolong this discussion. We shall relate only extracts from the remarks which are claimed to be the most offensive.[11] In doing so, we recognize there is some merit in the Government's argument that it is hardly fair to undertake an evalution of the effect which those portions of the argument complained of might have upon a jury, without considering the entire argument. We have read the entire argument for both sides, which occupies some 350 pages in the transcript of record, and we think it can be said that the argument, as a whole, does not disclose a picture as prejudicial to appellants as is argued or as is indicated by the particular statements referred to.

 In addition to extracts from the argument already quoted, serious complaint is made of the reading by counsel from a speech delivered by a noted son of Wis-

---

[11] "Not only, gentlemen of the jury, is this prosecution actuated by the Government because of the injury done to the public, but because of the fact that it is a terrible thing that a group of influential, wealthy millionaires or billionaires should take over the power, take over the control, the power to make prices, and to want to make them.

"A hundred lawyers employed—the very cream of the American Bar, the very best legal talent that these people can obtain—every one of them working night and day with suggestions as to how the red herring can be drawn across the clear cut issue of this case.

"And I confidently leave it with you, feeling that you will not let your Government and the United States and its citizens and society down.

"Now, just between yourselves, do you honestly think that these boys here (indicating counsel at Government table) fired with the enthusiasm of crusaders, as I say, and having given to this case every ounce of mental and physical strength they have, and I myself have contributed, also, would be trying to convict these men unless that was the wish and the desire of the highest officials in the government of the United States?

"You don't think the government of the United States would allow four or five lawyers to come out here and prosecute this case against them, against their wishes, or that the Secretary of the Department of the Interior would allow us to do it, if he didn't want it done?

"When combinations or corporations having the financial and the money power that these corporations have here, go out and take the law into their own hands and operate their business regardless of the desire of the Government, and without any consideration for the underdog or the poor man, then we can do one thing or another. We are going to stop it, as our forefathers stopped it before us and left this country with us as it is now, or we are going down into ruin as did the Roman Empire—

"Do you want to say that the vast sum of money that has been spent by the Government here—and not in payment of lawyers, either—running into hundreds of thousands of dollars, in trying to get before you the facts in this case, should be thrown to the winds and these men should go clear, and the world and the nation should be told that these combinations of capital can go out and take the law into their own hands, and they can rig any market they please? If you do—why, all right. I will get along. If you can afford to pay thirty cents or forty cents or fifty cents a gallon for gasoline, why, I will get a little once in a while, too."

consin at a Graduation Day exercise in 1873. In that speech there was vividly portrayed the advent of a terrible monster in the form of the accumulation of individual and corporate wealth. It was prophesied that the time was approaching when the question would be, "Which shall rule, wealth or man? Which shall lead, men or intellect? Who shall fill public stations, educated and patriotic free men, or the futile serfs of corporate capital"? However appropriate this speech might have been in the political arena, it certainly had no place in a court of Justice.

 We shall refer only to one other complaint concerning the argument. One of the defendants' witnesses had given testimony with reference to the shipment of gasoline to St. Paul via boat up the Mississippi River during the indictment period. This testimony was regarded by appellants as important since it showed, according to their theory, that competition within the indictment territory could not have been eliminated because of the accessibility of that territory to outside markets. Government counsel, in argument, advised the jury in effect, that he was familiar with conditions about which the witness had testified—that during that time the Government was building dams in connection with the nine-foot channel and that as a result "they had concrete clear across the river, spaced in so many ways that, as I say, you just couldn't get a row boat up there." Appellants lay considerable stress on the harm done by this statement, while the Government argues it was trivial. We do not think it trivial, and certainly, it was improper. If counsel desired to testify he should have gone on the witness stand and subjected himself to cross-examination.

The Government does not undertake to justify much of the argument and misconduct complained of, but it earnestly insists that any error committed is not of a reversible nature. As the case is to be reversed, there seems no occasion for us to make a determination in this respect. We shall merely express the opinion that some of the argument complained of was highly improper and that, taken in connection with the misuse of the Grand Jury testimony, heretofore discussed, would present a very serious obstacle to the affirmance of the judgment.

 Separate briefs and arguments have been submitted by the appellants, The Globe Oil & Refining Company (Oklahoma), the Globe Oil & Refining Company (Illinois) and R. H. McElroy, Jr., in which it is claimed that there is no substantial evidence connecting them with the alleged conspiracy, either in its formation or execution, and that the court erred in its refusal to direct a verdict as to them. From a study of the record we are not convinced that the trial court erred in this respect.

For reasons herein stated, the judgment as to each of the appellants is

Reversed and remanded.

SPARKS, Circuit Judge (concurring).

I concur in the opinion in all matters except that part which holds that the venue of this prosecution was properly laid in the Western District of Wisconsin.

The Sixth Amendment of the Constitution provides that the accused shall enjoy a trial by a jury of the State and district wherein the crime shall have been committed.

The crime here charged is a conspiracy to violate the Sherman Anti-Trust Law, and may be prosecuted only in the district where the conspiracy was formed or where some overt act in furtherance or execution of that conspiracy was committed. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Nash v. United States, 229 U.S. 373, 33 S. Ct. 780, 57 L.Ed. 1232; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S. Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989. All acts in furtherance or execution of the conspiracy and none other are deemed overt acts. An act is not an overt act merely because it is related to the individual enjoyment of the personal benefits which a defendant hopes to, and in fact does, receive as the ultimate result of the completely executed conspiracy. See United States v. Black, 7 Cir., 160 F. 431; Lonabaugh v. United States, 9 Cir., 179 F. 476; Rose v. St. Clair, D.C., 28 F.2d 189.

Paragraph 18 of the indictment describes the conspiracy as the combining and conspiring together of the defendants "for the purpose of artificially raising and fixing the tank car prices of gasoline in the aforementioned spot markets (which are referred to in paragraph 16 as 'the spot markets in the East Texas and Mid-Continent fields, and in Chicago, Illinois') and, as intended by them, defendants have artificially raised and fixed said spot market

tank car prices * * * at artificially high and non-competitive levels, and at levels agreed upon among them and have *thereby* intentionally increased and fixed the tank car prices of gasoline contracted to be sold and sold in interstate commerce as aforesaid in the Mid-Western area (including the Western District of Wisconsin)." (Italics supplied.)

Paragraph 17 of the indictment alleges: "Spot market tank car prices of gasoline tend to, and do, directly and substantially influence the retail prices of gasoline, i. e., the prices which consumers are required to pay, in that an increase in the spot market tank car prices of gasoline will, and usually does, result directly in an increase in the retail prices of gasoline."

Paragraph 19 of the indictment then proceeds to state that the conspiracy thus described was effectuated by the defendants engaging and participating in two concerted gasoline *buying* programs, referred to as "(a) the East Texas *buying* program and (b) the Mid-Continent *buying* program," for the purchase by the defendants from the independent refiners in spot transactions of the distress gasoline in the spot markets above referred to.

It is further alleged in paragraph 25 of the indictment that the conspiracy above referred to has operated and has been carried out in part within the Western District of Wisconsin, in the following manner: "In pursuance of said combination and conspiracy, defendant major oil companies (with the exception of Standard of Indiana and Gulf) have contracted *to sell* and *have sold* and *have delivered* large quantities of gasoline in tank-car lots to jobbers within said district at the artificially raised and fixed and non-competitive prices aforesaid and have arbitrarily exacted from jobbers within said district large sums of money * * * all by virtue of said combination and conspiracy and pursuant to the purposes and ultimate objectives thereof." (Our italics.)

Not one drop of the oil involved in the purchasing programs, which "effectuated" the alleged conspiracy, was purchased by any of the defendants in the State of Wisconsin, and yet, the Government contends that appellants' subsequent sale in the Western District of Wisconsin of a part of this distress gasoline involved in appellants' purchasing programs, should be considered as an overt act for the purpose of giving jurisdiction to the United States

District Court for the Western District of Wisconsin. It is my belief that no such sale can rightfully be considered as an overt act within the accepted meaning of those words, because the alleged conspiracy was "effectuated" and completed with respect to the gasoline thus sold in Wisconsin long before such gasoline was sold or offered for sale in Wisconsin. The indictment does not allege, the Government does not contend, and the evidence does not disclose, that these sales in Wisconsin had any effect whatever on the raising, fixing, or maintaining of gasoline prices in Wisconsin, or elsewhere. These effects were alleged and conceded to be caused by appellants' two purchasing programs which resulted in eliminating from immediate sale all distress gasoline on the tank car spot markets.

It is said that the Trenton Potteries case, supra, is authority for basing jurisdiction on sales. It must be remembered, however, that the conspiracy there was a sales conspiracy; that the defendants owned and controlled practically all of the product in the United States; and that by reason of that fact they were able to and did fix the price below which they had agreed not to sell any of the product. It is quite obvious that under those circumstances any sale of the product by any of the defendants in compliance with that agreement would be an act in furtherance and execution of the agreement, hence an overt act. In other words, the price was raised, fixed and maintained by the sales.

Here, however, the alleged conspiracy was effectuated by the defendants' *purchases,* and was in no manner furthered or effectuated by their subsequent sales or their sales contracts. The alleged crime would have been as completely and effectually proved under this record without the proof of appellants' sales as it was with such proof.

It is suggested by appellee that the indictment alleges an intention and purpose on the part of the defendants to profit by the general rise in price levels over the entire area, which was caused by their unlawful purchasing programs. We would have assumed this even without such an allegation, but it adds no force to appellee's argument. Suppose appellants had sold no gasoline in Wisconsin during the indictment period, would appellee contend that the venue would have been properly laid in Wisconsin? It has not so con-

tended, and we doubt that it would, because there would have been no overt act in Wisconsin. However, the alleged crime was committed and proved regardless of such sales; and its effect was to raise the price levels over the entire Mid-Western area, including the Western District of Wisconsin. The overt acts were those in furtherance and execution of the *buying* programs, and none of them was performed in Wisconsin. It is well settled that the venue must be laid in the district where the conspiracy was entered into, or in a district where some overt act was committed, and not in any district where the effect of the conspiracy was merely sensed.

It is further suggested that appellants concede that if defendants' sales were in pursuance of the conspiracy, they should rightfully be considered as overt acts. This record does not disclose that appellants made such concession. Moreover, the court is not bound by an erroneous concession as to the law, if made by either party or both parties. The conclusion of the majority opinion is no doubt based on what the opinion terms as "appellants' two tests for determining whether an act is overt: (1) Was the act in pursuance of the conspiracy; and (2) Did the act tend to achieve and advance the objects of the conspiracy?" Of course those tests were relied on by appellants, and their soundness cannot be questioned, for they are supported by an unbroken line of decisions covering many years. These tests, however, are not to be considered separately sufficient. The overt act must meet both tests, and this was appellants' contention both in brief and in argument.

Appellee seems to proceed on the theory that the indictment charged a conspiracy to sell, merely because it is alleged that defendants intended to, and did afterwards, sell the gasoline which they had purchased unlawfully. This language constituted no effective part of the illegal conspiracy and was not described in the charge. It was merely a voluntary recital of what the defendants expected to do with the gasoline which they might illegally purchase. In any event, such sales would not be illegal because it is not alleged, proved, or contended that such sales had any effect whatever upon the sales price.

For these reasons, I think the venue of this prosecution was improperly laid in the Western District of Wisconsin, and that the cause should be dismissed.